MILLER *v.* CACHE RIVER DRAINAGE DISTRICT No. 2.

4-7024                                      170 S. W. 2d 371

Opinion delivered April 5, 1943.

*Bratton & Coleman,* for appellant.

*Kirsch & Cathey,* for appellee.

GRIFFIN SMITH, C. J. March 18, 1936, the land commissioner executed the state's donation deed to J. F. Grooms, conveying lands described in the margin.[1]

Exactly a year later S. M. Miller, in similar manner, acquired certain property, shown in the footnote.[2] State and county taxes were paid by Miller for 1934-1940 and intervening years. Like payments were made by Grooms for 1936-1940 and intervening years.

In February, 1941, Cache River Drainage District No. 2 of Greene county filed its complaint, alleging that certain lands, including those claimed by Miller and Grooms, were embraced within the District and that betterments were delinquent. There was a prayer for foreclosure.[3]

The defendants (appellants here) denied legal existance of the District. They asserted that its corporate status was dissolved by an order of the federal court. All limitation statutes were pleaded. Specifically, it was contended that Miller's property was not in the District. As to Grooms, insistence is that title to forty acres was

---

[1] Southeast quarter of the southwest quarter of section twenty-five; the north half of northwest quarter of section thirty-six, and the southeast quarter of the northwest quarter of section thirty-six, the three tracts being in township eighteen north, range three east, in Greene county.

[2] Lots one, two, and three, in the northwest quarter of section one, township seventeen north, range three east, in Greene county. [Section one is irregular. The three lots are in the northwest. Lot one is a strip containing 66.21 acres across the northern part. Lots two and three each comprise 39.02 acres and account for all land in the irregular quarter lying south of lot one.]

[3] Affairs of the District were being administered in the District Court of the United States for the Jonesboro division of the Eastern District of Arkansas in accordance with Chapter Nine of the National Bankruptcy Act. P. G. Haag was appointed trustee by the Court. The District Court certified the delinquencies to the Greene Chancery Court.

confirmed under authority of Act 296 of 1929, and the District lost its lien by failing to pay state and county taxes; hence, it is argued, there was no tax for which the District could sell, and the donation deed is paramount.

The District was created by county court order of September 17, 1919. Lands in township seventeen were not included. An engineer's map showing that lands in township eighteen were embraced within the District was filed January 9, 1920. Estimates and plans filed by the engineering firm January 9 recite proposals to dig a lateral ditch extending from township eighteen along the east line of section one in township seventeen. The commissioners' assessment roll was filed with the county clerk February 2, 1920. It included charges against lands in township seventeen. Concurrently the county clerk attached his certificate that benefits would aggregate $691,841.44.

Miller's attack upon the District alleges disregard of § 4462 of Pope's Digest. Effect of the pleading is that there was want of due process.

It must be conceded that appellant Miller is correct in his contention that the statute was not complied with. If the record ended here we would readily agree that the decree should be reversed. But there is more. The county clerk, testifying from records, stated that although assessed benefits were $691,841.44, reductions by the [county] court amounted to $13,960.65, leaving $677,880.79.

May 1, 1920, commissioners asked the county court for assessments payable in installments to retire a proposed bond issue of $550,000. In this petition it was recited that assessed benefits aggregated $677,880.79. The court authorized issuance of the bonds, to be dated January 1, 1920. An undated county court judgment approved "all matters" relating to organization of the District, employment of engineers and attorneys, and other transactions.[4]

---

[4] It is not shown whether the undated order preceded or followed petition of the commissioners (May 1, 1920) and the judgment thereon. It appears as Exhibit "B" to the deposition of Charles A. Wood.

W. A. Branch, county judge when the District was formed, was permitted, without objection, to testify that a tax was extended against lands in section one, township seventeen, "the very first year, which was 1921, and payments were made by the respective land owners for a number of years."

Evidence is decisive of the proposition that commissioners and the county court, in all dealings subsequent to February 2, 1920, regarded lands in section one of township seventeen (and in other sections of the same township) as being a part of the District. This conclusion is inescapable when it is seen that the court's order reducing benefits left net assessments at $677,880.79. The records do not disclose that any of the reductions applied to the acreage now claimed by Miller—lands owned by Bertig and Kitchens when the District was formed.

Anticipating that legality of the District as it affected township seventeen would be questioned, a curative Act was passed by the Extraordinary Session of the Forty-Second General Assembly. It appears at page 2322 as Act No. 273, approved February 20, 1920—18 days after the county clerk received from the commissioners assessment rolls including lands in township seventeen.

Section 1 of Act 273 not only undertook to cure organizational defects, but contains this language: ". . . said District is duly established as a drainage district, organized under the provisions of Act 279 . . . of 1909."

It is contended this Act has no application because, as appellant Miller says, legislative intent related to Cache River Drainage District No. 2; and, since the District as legally created did not embrace the questioned lands, the so-called curative Act did nothing more than repair irregularities pertaining to a District with boundaries extending no farther south than the south boundary of township eighteen.

Approval of Act 273 was anterior to the county court's finding that assessed benefits were $677,880.79,

but subsequent to the filing of assessment rolls. Act 273, with an emergency clause, gave property-owners, twenty days within which to protest in chancery court.

Validity of *Cache River Drainage District Number Two* [5] was upheld by this court December 11, 1922, when W. C. Taylor and others appealed from an adverse decree. In the opinion it is said that authority of the legislature to assess betterments in improvement districts has been repeatedly recognized. Also, the legislature may validate assessments made by other agencies. See *Burton* v. *Harris*, 202 Ark. 696, 152 S. W. 2d 529.

In the Taylor case commissioners of the District sought judgments for delinquent betterments and a decree foreclosing liens. Although the property here contended for by Miller was not involved—taxes having been paid—the east half of lot one, the west half of lot one, and lots two and three in the northeast quarter of section one, township seventeen, were ordered sold, as were other lands in township seventeen. The court found that the District was established under provisions of the general drainage laws enacted in 1919, . . . and that "the list of lands set out as exhibits to plaintiff's complaint are within the limits of Cache River Drainage District No. 2, and there has been levied against the benefits previously assessed in said district the amount of taxes due for the year 1921."

The fact that lands now claimed by Miller were not in the decree prevents the Taylor decision from being *res judicata* in respect of the instant suit. But the decree is conclusive that lands in township seventeen were in the drainage district. Without doubt it was sought to annex them by action of the commissioners in approving and filing the assessment roll aggregating $691,841.44, pertaining to lands in townships seventeen, eighteen, and nineteen, and by the county court's act in making assessments of $677,880.79 after reductions of $13,960.65 had been allowed.

We think the decree which resulted in the appeal of Taylor and others was a final adjudication that lands in

[5] *Taylor* v. *Board of Commissioners of Cache River Drainage District No. 2*, 156 Ark. 226, 245 S. W. 491.

section one of township seventeen were in the District, and that it was the legislative intent by Act 273 of 1920 to either create the District embracing the larger area, or to confirm what the commissioners and county court had done.

Final questions are, Was the District's lien as to forty acres of land claimed by Grooms destroyed by state confirmation in 1931? Were assessment liens terminated when the property was sold to the state? May either Grooms or Miller prevail because of adverse possession, or by virtue of § 8925 of Pope's Digest?

In *Harris v. Little Red River Levee District No. 2,* 188 Ark. 975, 69 S. W. 2d 877, it is said that ". . . sale of lands to the state for nonpayment of taxes has the effect of suspending the enforcement of special improvement taxes against the lands during the time the title remains in the state or until the lands return to private ownership." This declaration of law was made upon authority of *Stringer v. Conway County Bridge District,* 188 Ark. 481, 65 S. W. 2d 1071. The Stringer case refers to *Turley v. St. Francis County Road Improvement District No. 4,* 171 Ark. 939, 287 S. W. 196. The lien in the Turley case was held to be preserved by force of § 5433 of Crawford & Moses' Digest applicable to road improvement districts. Similar language similarly construed was used in the special Act creating the bridge district involved in the Stringer case. Corresponding wording is found in § 4465 of Pope's Digest pertaining to drainage districts. It will be observed, however, that the Harris-Little Red River case involved a levee district. Another case is *Wyatt v. Beard,* 179 Ark. 305, 15 S. W. 2d 990. Lands lying within Road Improvement District No. 1 of Izard County were involved, and the rule in *Turley v. St. Francis County Road Improvement District No. 4* was applied.

Priority of liens between improvement districts is discussed in *Board of Commissioners of McKinney Bayou Drainage District v. Board of Directors of Garland Levee District,* 181 Ark. 898, 28 S. W. 2d 721. The Turley and Wyatt cases are cited. This statement appears in the

opinion: "If a sale of lands, under the paramount lien of the state for delinquent taxes does not extinguish the inferior or subordinate liens of improvement districts, it necessarily follows, we believe, that a sale for delinquent taxes in an improvement district that is prior only in that it was first created would not extinguish the lien of another district subsequently created by the state." Here, it will be observed, is a reference to "liens of improvement districts," without restricting the language to road improvement districts as contemplated by § 5433 of Crawford & Moses' Digest.

*Hopper* v. *Chandler,* 183 Ark. 469, 36 S. W. 2d 398, was another case involving a road district. The *Turley-St. Francis County Road Improvement District* case is cited as authority for the holding that sale by Road Improvement District No. 4 of Jefferson County while title was in the state was void.

In the Harris-Little Red River case contention was that the appellee had estopped itself by filing an intervention and failing to tender or pay taxes due the state; hence, it could not thereafter assert a lien. After referring to § 8 of Act 296 of 1929, the opinion says that the rights there accorded are privileges:—"Certainly it was not the intention of the legislature to force improvement districts to pay the state's taxes upon lands embraced within said district, otherwise to lose their improvement taxes after confirmation of the tax title in the state." A headnote to this case is: "One who purchases lands from the state after title has been confirmed must pay the taxes due levee and drainage districts to extinguish their liens."

The limitation statute (Pope's Digest, § 8925) under which appellants claim against the District is printed as a footnote to *Ware* v. *Dazey,* 201 Ark. 116, 144 S. W. 2d 463. This statute was construed in the Ware-Dazey case. Ware's entry was held to have been authorized:— "While [Ware] held adversely in respect of those who might have claimed under prior ownership, yet insofar as the state was concerned he entered permissively. His

right under the [donation] certificate was to occupy the land. This he did with consent of the state.''

Appellants in the instant appeal took possession of lands as to which the District had liens. Section 8925 was not intended to afford relief against such rights.

Affirmed.